Okay. Well, okay. Case 15-1599, Hatcher v. Board of Trustees of Southern Illinois University at all. Hello. I looked for you there, but you were there. Hello, Ms. Carando. Good morning, your honors. May it please the court, Mr. Cooper. I'm Cassie Carando representing plaintiff appellant Dr. Laura Hatcher. Although the court has such power, plaintiff is not asking the court to sit as a tenure committee and weigh her credentials for tenure. She's asking the court to correctly apply the summary judgment standard and find that a genuine issue of material fact exists regarding the reason Dr. Hatcher was denied tenure and promotion. Such an analysis necessarily includes information regarding the credentials of Dr. Hatcher and her male counterparts since different standards were applied to Dr. Hatcher and those male counterparts. Well, my question to you is this. The members of the College of Liberal Arts Standing Committee on Promotion and Tenure voted 5-4 to grant tenure and 5-4 to deny promotion. Do you contend that those Well, if not, how can we hold that the asserted reason for termination was pretextual when the college similarly identified Professor Hatcher's research as weaker? I think where we focus is on mainly the tenure vote and where the pretext comes in as at the next level where the chair, Kim Flynnard, was involved in the process. And following her vote, she denied both promotion and tenure instead of granting tenure but denying promotion like the college did. Following her decision, which was both negative votes, it went to the JRB, the Judicial Review Board, and they voted on their committee, they voted to grant her both tenure and promotion because they found that the process to date had not been followed correctly and there were errors. But I think the question is why would the dean's decision, which was asserted to be based on the quantity of research, why would that be pretextual if that's very similar to the issue that the committee at the college level had also zeroed in on? Now they came out slightly differently because they voted for tenure, but when the dean says it's research and it's because of research that I think we should not grant tenure, why is that pretextual? As far as the dean's vote, there were differences in how she treated the females and the males. So for instance, in Dr. Bloom and Dr. Hildreth's letters, she included language that the department is in the best role to make decisions regarding scholarship. That same language wasn't included for Dr. Hatcher as the only female. Additionally, in writing her recommendation letter for Dr. Bloom, she took comments from the external reviewers who were also at the initial stage giving feedback to the department, the chair, and the college as to whether a particular candidate should be granted tenure and promotion or not. She took negative comments from those external reviewer letters and explained them into a positive connotation. For Dr. Hatcher, she took seemingly positive comments and put a negative twist on them. So for instance, in Dr. Hatcher's case, external reviewers said that although she's in a narrow field, it's not mainstream, a law and society scholar isn't mainstream, that her contribution to the subfield has been great or she's on a trajectory for important works in the future. For Dr. Bloom, negative comments such as, you know, this article is very narrow, they were explained away by Dr. Kemp-Leonard, the chair. So that's where the pretext comes in, is the differential treatment between the male counterparts compared to Dr. Hatcher. Based on the evidence in the record, a jury could determine that Dr. Hatcher was denied promotion and tenure because of her gender or at least that gender played an impermissible role. Is there any evidence other than the comparison with Drs. Bloom and Hildreth who were granted tenure that you would rely on? There's a comparison to Dr. Hilliard. He wasn't in the Department of Political Science, he was in the Department of Criminal Justice, and he's also a law and society scholar, so him and Dr. Hatcher are the exact same subfield. Now when Dr. Hilliard went up for promotion and tenure in the Department of Criminal Justice, the chair of that department at the time was Dr. Kemp-Leonard. So there's a comparison there as well. Dr. Hilliard being in the same subfield, it's narrow, not mainstream, doesn't get very much recognition. How Dr. Kemp-Leonard looked at it for Dr. Hilliard was that he was an asset to the department, that they should be lucky to have him because it's so narrow, it's not mainstream. For Dr. Hatcher it was the opposite. It was narrow, it was not mainstream, but she wasn't an asset. Wasn't Kemp-Leonard in a very different position at that time as Hilliard's department chair versus dean of the college when Dr. Hatcher was up for tenure? I wouldn't say extremely different. She's still in the process, still involved in making the recommendations, she's just not as far up the chain as she was, or as she is now. And there's nothing in the university's procedures that says the dean or provost can't disagree with the department's assessment of tenure qualifications, right? No, there's nothing in the record that, or in the policies that say they can't disagree. And you're not trying to suggest that higher levels of review are just a rubber stamp. There has to be some input at that level. No, I agree with that. The department colleagues, it was McClurg, Shercott, and Clinton all agreed that Drs. Bloom, Hildreth, and Hatcher were similarly qualified. So if one should be tenured, all should be tenured. After Dr. Kemp-Leonard's decision to deny Dr. Hatcher tenure and promotion, Dr. Clinton asked Dr. Kemp-Leonard, you know, why is this decision made? Why weren't my comments taken into consideration? And Dr. Kemp-Leonard wouldn't give a clear answer. Dr. Clinton said she just waffled about and wouldn't give an answer. So Dr. Clinton actually testified that the only reason he could see for the difference based on his analysis of their qualifications and credentials was the only difference between Dr. Hatcher and the males was gender. But why does that make sense when the votes were clearly very different as to all three of those candidates? I think it's being in the actual college environment, going through the process, and looking at Dr. Clinton's input on it, his analysis of everything. I think it boils down to his understanding of why the votes were different based on the credentials of the three. See, following Dr. Kemp-Leonard's denial of tenure and promotion to Dr. Hatcher, she appealed, she grieved with the JRB, and they granted her promotion and tenure, but that decision wasn't forwarded to the board for ratification. So ultimately, Dr. Hatcher was denied promotion and tenure even following the JRB's positive vote. So these facts present a genuine issue of material fact regarding the reason for Dr. Hatcher's denial, such that a jury should weigh the facts, judge the credibility of the witnesses, and make a determination instead of the district court doing so. Does the record tell us if she's still teaching at SIU? I don't believe it does, but she is not. Once her tenure and promotion was denied, she was put on a one-year term contract, and once that ended, she could no longer work with SIU. Defendants argued that Dr. Hatcher admitted that she could not prove her case, that she had no evidence of gender discrimination. What I'd like to point out about that is that Dr. Hatcher testified in her deposition in direct response to counsel's questions, and at least one of those was prefaced with the phrase, as you sit here today. The additional questions on that same line, there was an inference that it's, as you sit here today, do you have any evidence of gender discrimination? What counsel appeared to be looking for was a smoking gun, and that's something that Dr. Hatcher has never claimed to have. What Dr. Hatcher has shown the court and what's in the record is a mosaic of evidence giving rise to the inference that this was gender discrimination or it was improperly motivated by her gender. Additionally, on March 20, 2014, when Dr. Hatcher was deposed, she had received some discovery prior to that, but following her discovery, she received over a thousand pages, and there were also seven more depositions taken following her own. So to characterize Dr. Hatcher's testimony as showing that she doesn't have any evidence that the denial of her promotion and tenure was based on her gender is improper. It proves nothing other than Dr. Hatcher's knowledge of the evidence that was discovered as of the date of her deposition. Can I ask you about your retaliation claims? What are you alleging were the adverse actions that were taken? The protected actions, the EEOC charge, and the complaints of the concerns of sexual harassment, and in retaliation for making those, there was a two-week time frame between the reports of the sexual harassment and the denial, the ultimate denial. So it's the ultimate denial that was the adverse employment action? Right. And is the EEOC charge in the record? I don't believe the actual EEOC charge itself, just the references to the EEOC charge are in the record. Defendants also argue that Dr. Hatcher couldn't be tenured without promotion because the college's policy states that it's expected that both will happen simultaneously, and expectations is not a mandate. What defendants fail to acknowledge is that SIU's policy, which supersedes the college's policy, states that tenure can occur in any role, and further, assistant professors have been tenured in the past. A jury could weigh the evidence and judge the witness's credibility to determine that Dr. Hatcher was treated differently than her male counterparts and denied promotion and tenure because of her gender. As to the second part of the appeal, Dr. Hatcher maintains that she properly pled count to, as Judge Shaw noted, the protected activity and the retaliation we just discussed. The district court determined that the protected activity wasn't specifically identified. The EEOC charge and the concerns that Dr. Hatcher reported regarding sexual harassment were both in the complaint, albeit not directly in count to, just incorporated within. Were the sexual harassment allegations incorporated within count to? Because they're first mentioned in count four, and in count two it says, based on what's stated above. I thought there was one reference. Maybe everything's incorporated up to that point, but the sexual harassment allegations don't come up until count four. I thought there was a reference in the factual part of the complaint, but I could be mistaken on that. Dr. Hatcher acknowledges the district court's discretion to find count to deficient, but where she disagrees with the district court is the dismissal with prejudice without leave to amend. As noted, it was a minimal deficiency. It was saying that the protected activity was not specifically identified, so to do that, really, it's a minimal amendment to the complaint to specifically allege the protected activity. The district court was told in our response in opposition to the motion to dismiss, and in oral arguments on the same, what the protected activity was, and a request for leave to amend was made both during the response in opposition and in the motion to reconsider. For count four, Dr. Hatcher admits that she inadvertently mispled count four by stating that she was a mandated reporter. Defendants were aware that she was never a mandated reporter. They wrote the policy that dictates who a mandated reporter is and who it is not, and a mandated reporter is the administrative, and Dr. Hatcher doesn't fall within that. To correct this error, it would be merely correcting her misstatement and stating that she was not mandated to report concerns of sexual harassment, and therefore, her speech was protected under the First Amendment. But didn't the district court also say that even if she were merely encouraged to make these reports, that that would be speech as an employee and not protected First Amendment activity? It did, but at that point, it was on a motion to dismiss, which goes to whether the complaint is sufficiently pled or not. I think what the district court did was delve into an actual analysis that was more appropriate for summary judgment at that point. But how would your proposed amendment have cured the problem that the district court identified? If the district court has said, even if it's encouragement, that's not going to be First Amendment. The case law on point states that it has to be within the scope of your employment, so a job duty or you being mandated, simply encouraged or some expectation on some level that you need to come and report these concerns isn't sufficient. For instance, if it's within your job to complete memos regarding your thoughts on a case and then submit those for consideration by someone, your supervisor, that falls within the scope of your job duties. For Dr. Hatcher, nothing in her job duty concerned her complaints of sexual harassment or passing those concerns on to someone higher than her own position. Thank you. Good morning, Mr. Cooper. Good morning and may it please the court. I'd like to begin where Judge Rosenstengel ended in her carefully thought out opinion granting summary judgment to the university in this case. And she wrote, simply put, there is not even a scintilla of evidence from which the trier of fact could find that the university's proffered reason for denying tenure to Dr. Hatcher was deliberately false or motivated by the fact that she is a woman. Well, the chair of the Department of Political Science believed that Leonard selected only negative language for inclusion in her recommendation and that it evidenced preconceived desire to deny Hatcher tenure and promotion. Should that be enough to establish a genuine issue of fact as to pretext? No, Your Honor, for several reasons. First of all, it is not unusual at all, as we know, and many of these kinds of cases have come before this court. We know it's not unusual at all for academics to disagree about what emphasis should be given, for instance, to an external review, to an assessment of teaching or service or research. Dr. Clinton's testimony on that point that you're referring to, Your Honor, is his opinion as an academic, which he's fully entitled to have and to give, that she, being the dean, she should have given additional emphasis to external reviewers. That's his judgment, and that wasn't the judgment of the dean, who, as I think all of you have noted in your questioning, the system at Southern Illinois University contemplates a multilayered review, and each level of review anticipates that there is going to be a separate and careful consideration of the tenure and promotion dossier of each candidate. It is not a situation where it is enough for the department members to support a candidate for tenure and that there's simply a rubber stamp at the college committee by the dean, by the provost. That is not the situation that exists under these circumstances. So while Dr. Clinton, as department chair, is fully entitled to give his opinion as to her bona fides and her qualifications for tenure and promotion, that does not guide and need not guide the decision of the dean. And, in fact, of course, she relied on a number of considerations in determining that Dr. Hatcher's dossier was simply insufficient from the standpoint of research to warrant tenure. Judge Shaw, you and Judge Rovner, you both pointed out that an important part of the process was the COLA committee, the College of Liberal Arts Committee deliberation, where there was a 5-4 vote in favor of tenure, but a 5-4 vote against promotion. Very unusual. We pointed out in the brief that while it's potentially possible for someone to obtain tenure without promotion, the COLA papers themselves speak to that and say that that is not what is anticipated. That, in fact, the chairman of that committee, of the COLA committee, testified that a negative vote on promotion, from his point of view, was tantamount to a negative vote on tenure as well. How many times has it happened that tenure has been granted without promotion? I don't know that, to answer that question. I believe Dr. Shercott testified that he was unaware of any instances in the COLA committee, during his time in the COLA committee, where that has occurred. But even assuming it had occurred in the past. This was important to the dean, the fact that you had this highly divided split vote. And not only that, but she found, when she did her own independent review of the dossier, that the fact that Dr. Hatcher had one peer-reviewed published article during her six-year probationary period  to warrant tenure and promotion. And Dean Kimberly Kemp-Flannard was compassionate in her letter. She wrote that this was a difficult decision, but her assessment was that it just simply wasn't good enough to have one peer-reviewed publication. Now, of course, we know that Dr. Hatcher has made much of her belief that she was as qualified as Drs. Bloom and Hilliard, in terms of her dossier. But that's simply not true. Both of them received unanimous, or near unanimous, votes by the COLA committee for both promotion and tenure. I believe 10-0, 10-0 in the case of Bloom, 10-0, 9-1 in the case of Dr. Hilliard, I do believe. And moreover, it is undisputed in this case that both of them had six peer-reviewed publications to their credit during their probationary time at Southern Illinois University. So, really, they weren't comparable. And the reason I bring that up, because it does relate to the issue of pretext, and Judge Rosenstengel pointed this out in her opinion, if there were a case presented to this court where there was an argument that Dr. Hatcher was so much more qualified than those to whom she compares herself, then perhaps that would support an argument that the dean's recommendation against promotion and tenure and the provost's recommendation against promotion and tenure were pretextual. And that's what the case law says. If you compare candidates in the pretext analysis and there's such an overwhelming difference between comparators and the plaintiff is so far superior, then perhaps that supports a triable issue of fact on the issue of pretext. But, of course, that doesn't exist here. And we haven't even talked about the milieu that we're in, and that is, of course, academic decision-making. Where we have decisions, Judge Rovner, of course, you'll recall the case involving St. Xavier University, the Adam and Reyes decision that you were on, where very similar, actually, in a number of material respects to this case, where this court focused on the pretext analysis and held, actually, while in that case, I believe, Judge Rovner, you correct me if I'm wrong, but I think there were actually statements relating to the religious preferences of the plaintiff in that case, yet that was not enough evidence to support a jury trial on the issue of pretext. And similarly here, there is simply nothing that demonstrates that either the dean or the provost did not honestly believe that Dr. Hatcher's dossier with regard to research was insufficient. Does the record indicate why the College of Liberal Arts Standing Committee on Promotion and Tenure reviewed her research and publications as so different from Bloom's as to other than, you know, the number? Well, I guess I would respond this way, Your Honor. There is no comparative analysis that is done by the COLA Committee. In other words, when they review a dossier, they talk about Dr. Hatcher's dossier. When they review Bloom, they talk about Bloom and Hilliard-Hilliard. So there isn't any sort of analysis done by the members of the COLA Committee saying, well, we thought Bloom was okay, but Hatcher was this, and so forth and so on. There's no comparison done. So we really can't know that, but we do know starkly in the votes that they viewed the – and not only the votes, but there are accompanying letters that the COLA Committee chair writes with regard to the deliberations of the COLA Committee, and those are a part of the record in this case. And in each case with regard to Hilliard and Bloom, the COLA Committee members held unanimously that Bloom and Hilliard had sufficient research to warrant promotion and tenure at Southern Illinois University. And that, of course, is the key point here, is that in something that is actually not even mentioned in the briefing by Dr. Hatcher, and that is that the COLA Committee in its written document describing their deliberations specifically states that Dr. Hatcher's dossier demonstrated excellence in teaching and service, but not in research. If I could, I'd like to answer a few other questions or address a few other questions that were raised during my friend's remarks earlier. I think we've already talked about the importance of the COLA Committee deliberations and why the COLA Committee is essential to how the dean made her decision in recommending against promotion and tenure for Dr. Hatcher. Can I steer you into the retaliation issue? You may. Let's talk about retaliation. Can you explain to me why Count 2 isn't adequately pled it says she filed an EEOC charge, it says the EEOC charge was mentioned during her grievance appeal, and it says that Chancellor Cheng overruled the board in a way that was tied to the pending grievance. As a pleading matter, why doesn't that put the defense on notice as to what the retaliation theory is all about?  The ultimate adverse employment action was something done by the chancellor, and I think that was the nature of your question that you were asking my friend earlier. The theory of this case has always been, as pleaded, and as argued in the court below, and I believe as briefed, is that the adverse employment action was the denial of tenure in terms of the recommendation of the dean and the provost, both of which, of course, long predated the EEOC charge. But it's possible to have multiple adverse decisions. Well, I'm not sure it is possible in this case. I suppose it would be possible in some cases, but in fact the plaintiff has pleaded specifically in Count 4, you'll remember this Judge Shaw, that the decision by the dean to recommend against promotion and tenure for Dr. Hatcher was fatal to her application for promotion and tenure. It was a fait accompli when the dean gave a negative recommendation, and that's why she said the dean's involvement was so critical, and I think we heard that during my friend's comments this morning. And furthermore, in looking at the chronology, we know that in fact the chancellor sent a letter to Dr. Hatcher in April of 2012 denying tenure and giving her the one-year contract, terminal contract. And it's not until October of that same year, many months later, that the EEOC charge was actually filed. So with regard to the EEOC charge, it's simply not possible to link up the EEOC charge to the adverse employment action where both the dean and the provost make a determination that her dossier is insufficient. But you've got the board's decision in between there, which then could theoretically put tenure back on the table because of the way they voted, and then the chancellor overrules their decision. When you're talking about the board, I'm assuming you're the Judicial Review Board. Let me talk about what they do for just a moment. The JRB is empowered to do one thing and one thing alone, determine whether or not the procedures with regard to the tenure and promotion process were followed. They have no power to review the substance of a tenure and promotion decision. In fact, they specifically eschew that responsibility because they're not qualified to review the dossier. They don't make a review of the dossier for purposes of determining qualifications for tenure and promotion. And in this case, what they found was that procedures had not been followed because the provost's letter with regard to Dr. Hatcher contained insufficient detail as required by the policies. And so the chancellor, in accepting in part and rejecting in part the recommendation, which is all it is, a recommendation of the JRB, determined, you know, you're probably right. There could have been more detail in the letter from the provost to Dr. Hatcher with regard to promotion. But the chancellor appropriately rejected, as she had done previously, the notion that because of a procedural glitch that there should be tenure and promotion granted to Dr. Hatcher. So that is the nature of the review that the JRB does, and that is what the chancellor was looking at when that came to her many months later. The decision, in other words, Your Honor, with regard to Dr. Hatcher's promotion and tenure had been made with all but the issue of procedural regularity long before Dr. Hatcher ever filed an EEOC charge. And I believe that addresses fully the question concerning the timing issue. Moreover, there is no question that Dr. Hatcher had multiple opportunities to plead this case as she saw fit. She, in fact, filed an amended complaint, as the court is well aware. And here we are today, as we were in the district court, still not knowing what facts Dr. Hatcher believes she should have pled or could have pled that would save her retaliation claim under Title VII or her retaliation claim under the First Amendment. I see I'm out of time, and unless there are other questions, I want to thank the court very much. Ms. Carando, you used your time, but I'm going to give you two more minutes, if you wish them. Thank you. Thank you. I just have a couple points I'd like to make. Mr. Cooper brought out several reasons Dr. Kemp-Leonard testified for her decision to deny promotion and tenure. Again, I want to point out that weighing Dr. Kemp-Leonard's credibility is an issue for the jury. It's not an issue for the district court. So whether Dr. Kemp-Leonard's reasons for denying promotion and tenure, whether those are believable or not, isn't something the district court should have decided. To say that Dr. Hatcher had only one peer-reviewed article is inaccurate. It's actually two peer-reviewed articles, if you look at her credentials. And there were also multiple presentations between 30 and 40, and I believe nine published book reviews along with some other published materials. It wasn't just Dr. Hatcher's belief that she deserved tenure. Dr. Clinton also believed that. Dr. Shercott pointed out that there was a disparity between Dr. Bloom and Dr. Hatcher's votes. To say that Dr. Hatcher is so far inferior to the two male counterparts is unfair in this case. So I, on behalf of Dr. Hatcher, would ask the court that you reverse summary judgment on Count 1, reverse the dismissals with prejudice on Counts 2 and 4, and remand the case back to the district court. Thank you. Thank you. Thank you very much, Ms. Carando, Mr. Cooper. The case will be taken under advisement.